IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

August 7, 2019 Session

**STATE OF TENNESSEE v. ANTOINE HINTON**

**Appeal from the Criminal Court for Shelby County**
**No. 16-06788        John Wheeler Campbell, Judge**

_____

**No. W2018-01931-CCA-R3-CD**
_____

A Shelby County Criminal Court Jury convicted the Appellant, Antoine Hinton, of first degree felony murder; especially aggravated kidnapping, a Class A felony; aggravated kidnapping, a Class B felony; employing a firearm during the commission of a dangerous felony, a Class C felony; and reckless aggravated assault, a Class D felony, and he received an effective sentence of life plus twenty-eight years in confinement. On appeal, the Appellant contends that the trial court committed reversible error by failing to instruct the jury as provided by State v. White, 362 S.W.3d 559 (Tenn. 2012), and that the evidence is insufficient to support his murder conviction because the underlying felony was complete at the time of the victim's death. Based upon the oral arguments, the record, and the parties' briefs, we affirm the Appellant's convictions and his total effective sentence of life plus twenty-eight years but remand the case to the trial court for amendment of the judgments to reflect that the Appellant's conviction of aggravated kidnapping in count three is merged into his conviction of especially aggravated kidnapping in count two and for correction of the judgments regarding concurrent and consecutive sentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed,**
**Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Claiborne H. Ferguson (on appeal) and John Dolan and James Marty (at trial), Memphis, Tennessee, for the appellant, Antoine Hinton.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Danielle McCollum and Theresa McCusker, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual Background

In December 2016, the Shelby County Grand Jury indicted the Appellant for first degree felony murder in the perpetration of kidnapping in count one, especially aggravated kidnapping with a deadly weapon in count two, aggravated kidnapping involving bodily injury in count three, and aggravated assault by strangulation in count four. Jeremy Lampkin was the named victim in count one, and Kaili Taylor was the named victim in counts two through four. The grand jury also indicted the Appellant for employing a firearm during the commission of aggravated kidnapping in count five.

At trial, Kay Campbell, Mr. Lampkin's aunt, testified that she and Mr. Lampkin had a "close" relationship and that he worked nights at FedEx. Mr. Lampkin attended Lane College for one year and transferred to the University of Memphis. He also took some classes at Southwest Tennessee Community College. Mr. Lampkin was not taking any classes at the time of his death but had about two and one-half years of college and wanted to be a sports physical therapist.

Kaili Taylor testified that in August 2015, she and the Appellant were in a "very serious" relationship and were talking about marriage. Ms. Taylor knew Mr. Lampkin from middle school. They exchanged text messages "every now and then" and were "just friends." Mr. Lampkin had told Ms. Taylor that he had a "crush" on her, but he knew she was dating the Appellant. Ms. Taylor said Mr. Lampkin was "very respectful" and never tried to have a romantic relationship with her.

Ms. Taylor testified that on the morning of August 16, the Appellant came to her apartment on Patterson Street. They had sex and planned to go to his apartment to wash clothes. While the Appellant was using Ms. Taylor's cellular telephone, Ms. Taylor received a text message from Mr. Lampkin. The Appellant read the message and wanted to know about Mr. Lampkin's and Ms. Taylor's relationship. Ms. Taylor told the Appellant that Mr. Lampkin was a friend from middle school. The Appellant got upset and asked if Ms. Taylor was having sex with Mr. Lampkin. The Appellant took Ms. Taylor's purse, which contained her keys and her Glock 19 handgun, out of her car. The gun was in a "brown cow-hide holster," and Ms. Taylor had a handgun carry permit for the weapon. The Appellant put Ms. Taylor's keys into one of his pockets and her gun into his other pocket. The Appellant had his own handgun, a forty-five-caliber firearm, in a holster on his side. The Appellant told Ms. Taylor to sit on the couch in her living room and looked in her telephone for information. Ms. Taylor said that the Appellant

was very upset and aggressive, that he accused her of lying, and that she was scared and "unsure about what was going to happen next."

Ms. Taylor testified that the Appellant started hitting her face, head, and body. She fell onto the floor a couple of times, and the Appellant kicked her stomach and chest. Ms. Taylor said she did not fight back because she was "scared . . . it would be worse abuse." She had bruises and a "busted" lip and told the Appellant that she needed to go to a hospital, but he refused to take her.

Ms. Taylor testified that the Appellant started texting Mr. Lampkin with her telephone and that the Appellant pretended to be Ms. Taylor in the texts. The Appellant told Ms. Taylor that he was going to get Mr. Lampkin to come to Ms. Taylor's apartment so that he could ask Mr. Lampkin questions. The Appellant also told Ms. Taylor that he was going to "put [Mr. Lampkin] at gunpoint," force Mr. Lampkin to "strip," and make Mr. Lampkin tell the truth about Mr. Lampkin's relationship with Ms. Taylor. Ms. Taylor said that the Appellant hit her on the left side of her head above her eyebrow, which created a gash and caused blood to run down her face. The Appellant made Ms. Taylor sit on the couch, and blood from Ms. Taylor's face got onto a pillow that was on the couch. Ms. Taylor identified a photograph of the blood-stained pillow for the jury.

Ms. Taylor testified that the Appellant continued sending text messages to Mr. Lampkin, trying to get Mr. Lampkin to come to Ms. Taylor's apartment. The Appellant then told Ms. Taylor that they were going to his apartment in Cordova, and they walked outside to his car. Ms. Taylor said that she was "really weak and dazed" and that she did not try to run from him because she was afraid he would "catch" her. The drive to the Appellant's apartment took about fifteen minutes. During the drive, the Appellant used Ms. Taylor's telephone to call Mr. Lampkin. The Appellant put the call on speaker phone so he could hear Ms. Taylor's and Mr. Lampkin's conversation. When Mr. Lampkin answered, Ms. Taylor asked him, "'What are you doing?'" Mr. Lampkin said he had "just woke up," and the Appellant hung up on Mr. Lampkin because he thought Ms. Taylor was trying to alert Mr. Lampkin. The Appellant continued to hit Ms. Taylor's face while he was driving.

Ms. Taylor testified that when they arrived at the Appellant's apartment, the Appellant had her sit on the couch. The Appellant sat in a chair across from her and continued to look for information in her telephone. The Appellant also continued texting Mr. Lampkin, trying to get Mr. Lampkin to go to Ms. Taylor's apartment. The Appellant again told Ms. Taylor that he was going to make Mr. Lampkin "strip" and make Mr. Lampkin tell the truth about their relationship. Ms. Taylor told the Appellant that "nothing was going on" with Mr. Lampkin and that she was being truthful. However, the Appellant accused her of lying and kept hitting her face. At some point, Ms. Taylor fell

- 3 -

onto the floor, and the Appellant kicked her stomach, chest, and face. The Appellant told Ms. Taylor to sit on the couch, wrapped a belt around her neck, and pulled the belt tight. The Appellant dragged Ms. Taylor onto the floor and pulled the belt tighter, and Ms. Taylor screamed that she could not breathe. When she was almost unconscious, the Appellant unwrapped the belt from her neck. Ms. Taylor crawled away, and the Appellant hit her back with the belt.

Ms. Taylor testified that her lip was swollen and bleeding, so the Appellant told her to put some ice on it. He also told her that Mr. Lampkin had texted back that Mr. Lampkin was going to Ms. Taylor's apartment. The Appellant wanted to get to Ms. Taylor's apartment before Mr. Lampkin, so the Appellant and Ms. Taylor got back into the Appellant's car. Ms. Taylor said that she was scared and that she did not think she had any choice but to go with the Appellant. The Appellant told Ms. Taylor that he was going to kill her and Mr. Lampkin if she was lying to him about their relationship.

Ms. Taylor testified that when she and the Appellant arrived at her apartment, he continued to hit her. Blood was all over Ms. Taylor, so the Appellant told her to go into the bathroom and clean up. The Appellant came into the bathroom and told Ms. Taylor that if she was going to act like a "'Ho,'" he was going to treat her like one. The Appellant ripped off Ms. Taylor's shirt and pulled off her pants, leaving her wearing only her bra and underwear. The Appellant hit Ms. Taylor, and she fell into the bathtub. The Appellant pushed Ms. Taylor out of the bathroom and into her bedroom, made her sit on the floor, and told her to put on a shirt.

Ms. Taylor testified that the Appellant unlocked the front door, went into the bathroom, and turned on the shower. He told Ms. Taylor that he had texted to Mr. Lampkin that Ms. Taylor was in the shower and to come into the apartment. When Mr. Lampkin arrived, he went into Ms. Taylor's living room and sat on the couch. The Appellant dragged Ms. Taylor into the living room, told her to sit on the floor, and pointed a gun at Mr. Lampkin. The Appellant told Mr. Lampkin not to move, ordered him to "strip," and demanded his telephone. The Appellant told Mr. Lampkin, "'You should tell the truth, because you see what I did to the bitch.'" The Appellant asked Mr. Lampkin how Mr. Lampkin and Ms. Taylor knew each other and if they were having sex. Mr. Lampkin replied that they were just friends. Ms. Taylor got up off the floor and told the Appellant to let Mr. Lampkin leave. The Appellant hit Ms. Taylor's face with the gun and told her to shut up, and Ms. Taylor fell onto the floor. She said that she was almost unconscious and that the room was "spinning."

Ms. Taylor testified that she heard the Appellant and Mr. Lampkin "exchange words" and that she heard Mr. Lampkin tell the Appellant, "'You've got me f***ed up.'" Mr. Lampkin "rushed" the Appellant and pushed the Appellant against the front door,

and they started "tussling" for the gun. Ms. Taylor got up off the floor, ran through the kitchen, ran out the kitchen door, and heard a gunshot. When she got into the parking lot of her apartment complex, she heard a second gunshot. She ran down the street and saw a man outside with his children. He asked if she needed help and took her into his apartment, and Ms. Taylor used his telephone to call her mother.

Ms. Taylor testified that the police arrived at the man's apartment and took her back to her apartment. She later went to a hospital. The police came to the hospital that night and showed her a six-photograph array containing the Appellant's photograph, and Ms. Taylor identified him as the man who beat her and lured Mr. Lampkin to her apartment. Ms. Taylor said she spent two days in the hospital. Her eyes were swollen, she received stitches in the cut above her eyebrow, and her top and bottom lips were "busted." The State introduced photographs of her injuries into evidence. Ms. Taylor said she did not find out Mr. Lampkin had been killed until she was about to leave the hospital.

Ms. Taylor testified that the Appellant telephoned her from jail in October 2015 and that she was "shocked" to hear from him. He wanted to know how she was doing and told her that he was sorry. A couple of days later, she received another telephone call from the Appellant. During the call, the Appellant claimed that Ms. Taylor was the only woman he loved and that other women in his life were just friends. Ms. Taylor still loved the Appellant and believed him. In subsequent calls from the Appellant, he told her that he wanted her to say that he did not lure Mr. Lampkin to her apartment and that he acted in self-defense. However, Ms. Taylor refused to lie for him. She said that a woman named Deonna Wimbley started contacting her and that she thought Ms. Wimbley and the Appellant were friends. Ms. Taylor stated that she started attending counseling and church and that she realized the Appellant was manipulating her and did not love her. In February 2016, Ms. Taylor stopped having any contact with him or Ms. Wimbley.

On cross-examination, Ms. Taylor acknowledged that the Appellant texted Mr. Lampkin and held her at gunpoint at the same time. Defense counsel asked, "How do you hold a gun and text?" Ms. Taylor answered, "[Y]ou hold the gun in one hand and you can text with your thumb [on the other hand]." Ms. Taylor gave a written statement to a police officer on August 25, 2015. According to the statement, the officer asked if Ms. Taylor and Mr. Lampkin ever had any type of sexual relationship, and Ms. Taylor answered, "'Yes, once before he helped me with some bills and let me borrow some money.'" Ms. Taylor told the jury that she did not remember making that statement and maintained that she never had sex with Mr. Lampkin. She stated that Mr. Lampkin had never been to her apartment prior to August 16, 2015, and that the Appellant "must have texted him the address."

Ms. Taylor testified that the Appellant was not pointing the gun at her when they walked outside his apartment to his car. Defense counsel asked why she did not run from him, and she stated, "But then he would have chased me down and probably beat on me some more." Ms. Taylor denied "making this up" and said she did what the Appellant ordered because "[i]f I told him no it would have resulted in me being beat, more." She said that she did not jump out of the Appellant's car while he was driving because she was scared and did not know where to go. Ms. Taylor did not see the text messages Mr. Lampkin sent to her that day because the Appellant had possession of her telephone. To her knowledge, though, none of the texts were sexual in nature. The police gave Ms. Taylor's telephone back to her two weeks after the shooting, but they had deleted everything from her telephone. Ms. Taylor visited the Appellant "multiple" times in jail before she stopped having contact with him.

On redirect examination, Ms. Taylor testified that prior to this incident, the Appellant did not want her to have any male friends. He also "secluded" her from her family and friends and always wanted to know her whereabouts.

Chenyilu Lewis testified that he was a firefighter and paramedic with the Memphis Fire Department. On August 16, 2015, he responded to a call at an apartment on Patterson Street. The police were already present, and Mr. Lampkin, who appeared to be about twenty-six years old, was lying on the floor. Mr. Lampkin's shirt was "covered in blood," and blood was on the floor around him. Mr. Lewis cut off Mr. Lampkin's shirt and saw two gunshot wounds. He put electrodes on Mr. Lampkin to measure the electrical output from Mr. Lampkin's heart, but the electrode monitor "flat-lined." Mr. Lewis later saw Kaili Taylor at the scene. He said that Ms. Taylor had "several hematomas, there [was] lots of swelling to her face, swelling around her nose, looked like she had been crying, she had multiple lacerations, [and] she was bleeding from cuts on her face." Ms. Taylor was "very distraught" and "wasn't all the way there, like her mind was focused on something else." Mr. Lewis applied bandages to Ms. Taylor's wounds, "started an IV," and transported her to the hospital in an ambulance.

Officer David Payment of the Memphis Police Department (MPD) testified that he was dispatched to Ms. Taylor's apartment at 12:45 p.m. on August 16, 2015, and arrived fifteen minutes later. Mr. Lampkin was lying on his back on the living room floor. A forty-five-caliber bullet casing was underneath a rug next to Mr. Lampkin's left leg, and a pillow that appeared to have blood on it was in the bedroom. Blood appeared to be on a bedroom wall, a living room wall, and the bathroom floor. Officer Payment did not find any guns in the apartment.

On cross-examination, Officer Payment acknowledged that he found only one bullet casing. He looked outside the apartment for another casing but did not find one.

Officer Payment found a box for a Glock nine-millimeter semiautomatic pistol in the apartment, but the box was empty. A screen in a window beside the front door had been pushed outside, indicating that a struggle had occurred inside the apartment.

Kelly Mason, Kaili Taylor's mother, testified that she received a telephone call from Ms. Taylor on the morning of August 16, 2015. Ms. Taylor was crying and having difficulty speaking, and Mrs. Mason knew something had happened involving Ms. Taylor and the Appellant. Mrs. Mason telephoned her husband, who was fishing, and told him that they needed to get to Ms. Taylor's apartment. She also telephoned Ms. Taylor's father and called 911.

Mrs. Mason testified that when she arrived at Ms. Taylor's apartment, the police were there. Mrs. Mason saw Ms. Taylor being put into an ambulance and followed the ambulance to the hospital. Mrs. Mason said that when she was allowed to see Ms. Taylor, she discovered that Ms. Taylor had been "severely beaten." Ms. Taylor's face was very swollen, her nose was broken, and she was "hooked up" to a lot of machines and monitors. That night, while Mrs. Mason was with Ms. Taylor in the hospital, Mrs. Mason received a telephone call from the Appellant. The Appellant addressed her as "'Mom,'" which was unusual, and wanted to know what Ms. Taylor was saying to Mrs. Mason and the police. Mrs. Mason alerted the police that she was on the telephone with the Appellant, and the police told her to keep talking with him so they could try to locate him.

Mrs. Mason testified that the Appellant sounded "cool, calm, collected." He told Mrs. Mason that Ms. Taylor needed to tell the police that "everything was a misunderstanding, an argument that had gotten out of control and that . . . everything that happened was because of self-defense." The Appellant also told Mrs. Mason to tell Ms. Taylor that he loved her, that he was sorry, and that "everything is going to be okay." The Appellant said, "I have one of the best attorneys, I have everything taken care of." Mrs. Mason asked the Appellant how Ms. Taylor was injured. The Appellant claimed that Mr. Lampkin "rushed" him, that they got into an altercation, and that Ms. Taylor "got in the middle of them and that is how she had gotten beaten so badly." The Appellant told Mrs. Mason that he needed to meet her somewhere because he had Ms. Taylor's purse, telephone, and keys.

Mrs. Mason testified that Ms. Taylor and Mr. Lampkin had been friends since middle school. She described their relationship as "like a brother and a sister" and said that Mr. Lampkin was "always very protective" of Ms. Taylor.

On cross-examination, Mrs. Mason testified that she had never seen Mr. Lampkin at Ms. Taylor's apartment but that Mr. Lampkin knew where Ms. Taylor lived. Defense

counsel asked her, "How do you know that?" Mrs. Mason answered, "Because my daughter told me."

Zachary Kurtzman testified that in August 2015, he lived in an apartment on Patterson Street. About 11:30 a.m. on August 16, Mr. Kurtzman heard a woman crying and being physically abused. Mr. Kurtzman heard "slaps" and heard the woman screaming, "'Please stop Antoine, Antoine.'" A man responded, "'Shut up, before I knock your ass out.'" Mr. Kurtzman said that he had "never heard anything like it" and that he was "scared to death." He stated that the incident lasted ten to fifteen minutes and that the man and woman were "arguing about possibly another man in her relationship." Mr. Kurtzman telephoned 911 but was put "on hold" and hung up.

Mr. Kurtzman testified that he heard two males arguing and wrestling and heard gunshots. He looked outside and saw a man walk out of an apartment. The man's right shoulder and hand were "covered in blood." The man looked around and walked back inside the apartment. About five minutes later, the man walked outside again. He was holding a purse and ran to the apartment complex across the street. Later that day, Mr. Kurtzman looked at a six-photograph array containing the Appellant's photograph. He circled the Appellant's photograph and wrote on the array, "This is the person I saw running from the scene. His right hand was covered in blood and [he] was holding his right shoulder." Mr. Kurtzman identified the Appellant in court as the man he saw on August 16.

On cross-examination, Mr. Kurtzman testified that he heard the two males arguing and scuffling before the shooting. After the shooting, Mr. Kurtzman looked outside and saw the Appellant holding his right shoulder with his left hand.

Antuan Andrews testified that in August 2015, he was a student at the University of Memphis. On the morning of August 16, Mr. Andrews's family helped him move into an upstairs apartment on Patterson Street. When they were finished, Mr. Andrews and his family were in the parking lot, and Mr. Andrews saw a woman run out of a downstairs apartment. He then heard "some tussling going on," heard a gunshot, and saw "what looked like somebody get knocked up against the window." Mr. Andrews and his family got into his car and "ducked" down. A man came out of the apartment, and "it looked like he was bleeding on his arm a little bit and he was kind of looking around." The man went back inside the apartment, and Mr. Andrews went upstairs to get his sister, who was still inside his apartment. While he was upstairs, he heard another gunshot. Mr. Andrews and his sister came downstairs and got into his car, and his mother drove them away from the scene. As they were leaving, Mr. Andrews saw the man come out of the apartment again. Later that day, Mr. Andrews looked at a six-photograph array

containing the Appellant's photograph and identified him as the man he saw come out of the apartment.

Sergeant Adam Pickering of the MPD testified that he processed three vehicles involved in Mr. Lampkin's death for evidence: a white Ford Focus, which may have driven the Appellant from the crime scene; a black Infiniti, which was the Appellant's car; and a silver Honda Accord, which was Mr. Lampkin's car. Sergeant Pickering did not find anything of evidentiary value in the Infiniti or the Honda. However, he found a purse on the Ford's front passenger seat. The purse contained a billfold, Ms. Taylor's identification, and an empty brown leather holster. On cross-examination, Sergeant Pickering acknowledged that the holster was designed to be worn inside a belt for the purpose of concealment.

Dr. Marco Ross, the Interim Chief Medical Examiner for Shelby County, testified as an expert in forensic pathology that he did not perform Mr. Lampkin's autopsy but reviewed Mr. Lampkin's autopsy report. According to the report, Mr. Lampkin received three gunshot wounds. One bullet entered Mr. Lampkin's right shoulder; traveled through his chest, right lung, and aortic and pulmonary arteries; and came to rest in his left chest cavity. Another bullet entered the right side of his chest, traveled through his right lung and liver, and came to rest in the right side of his back. The third bullet entered Mr. Lampkin's right thigh and exited the upper part of his right buttock. Dr. Ross said that Mr. Lampkin was wearing a shirt at the time of the shooting but that there was evidence of soot and stippling on the skin around the first gunshot wound, indicating that the muzzle of the gun was within one foot of Mr. Lampkin when it was fired. The order in which the gunshots were fired could not be determined. In addition to the gunshot wounds, Mr. Lampkin had a small, round "defect" on his upper lip which could have resulted from an altercation. His blood was negative for alcohol and drugs. Dr. Ross stated that the cause of Mr. Lampkin's death was multiple gunshot wounds and that his manner of death was homicide. On cross-examination, Dr. Ross testified that Mr. Lampkin was five feet, eleven inches tall and weighed 300 pounds.

Shawntae Dates testified that she met the Appellant in February 2014, that they began dating about one month later, and that they talked about getting married and having a child together. Ms. Dates graduated from college on August 13, 2015, and she was with the Appellant from the night of August 13 until she went to work on the morning of August 16. Ms. Dates left for work about 5:45 a.m. on August 16, but she and the Appellant texted each other all morning about "[h]ow much fun they had, how [they] were so in love and all that." Ms. Dates said she thought the Appellant loved her. Ms. Dates knew of Kaili Taylor but thought Ms. Taylor and the Appellant were friends.

Ms. Dates testified that about 12:00 p.m., she received a telephone call from the Appellant. The Appellant told her that he thought he had just shot someone and hung up. Ms. Dates tried to call the Appellant back, but he did not answer. Ms. Dates left work at 2:00 p.m. and received another call from the Appellant. He wanted her to pick him up, so she agreed to meet him in a warehouse parking lot. Ms. Dates arrived in the parking lot first. When the Appellant arrived, he was the passenger in a small four-door car being driven by a woman. The Appellant claimed the woman was a friend. The Appellant got out of the woman's car and was holding a large purse. The Appellant later told Ms. Dates the purse belonged to Ms. Taylor's sister.

Ms. Dates testified that the Appellant wanted her to drive him to the Target parking lot on Germantown Road to meet his lawyer. When they arrived, Ms. Dates waited in her car while the Appellant talked with his attorney, Art Horne. Mr. Horne took photographs of the Appellant's face and hands. Ms. Dates then drove the Appellant to his apartment complex, and Ms. Dates went into his apartment and got clothes for him. The Appellant wanted to go to a motel but did not want to stay in Memphis, so she drove him to a motel in Southaven, Mississippi. The Appellant gave her money for a room, and Ms. Dates went inside and rented the room.

Ms. Dates testified that the Appellant told her about what had happened, and she stated as follows:

> He told me that he was going to his friend-girl's house to exchange his car, because he had to keep his car - he supposedly had two cars at the time and he had to keep one car there, because his apartment complex wouldn't allow him to keep both cars there.
>
> So he went to exchange the car and Kaili wasn't there, it was the sister that was there and he went in to pretty much get the keys for the car and there was a guy that was there and the guy was pretty much mugging him and looking at him, crazy.

She said that "mugging" meant the man was "looking at him up and down, like why are you here." The Appellant told Ms. Dates that he and the man got into an argument, which turned into a scuffle. They began fighting, the man slammed the Appellant's head against the door, and the gun "might have went off." Ms. Dates said that the Appellant had scratches on his hands and forehead and that she believed his story.

- 10 -

Ms. Dates testified that the Appellant had two attorneys. While Ms. Dates and the Appellant were at the motel in Southaven, the Appellant was talking with his attorneys "back and forth" on the telephone and "was pretty much saying it was self defense." The Appellant's attorneys told him that a warrant for his arrest had not been issued and to "sit tight." The next day, Ms. Dates and the Appellant rented a room at a different motel in Whitehaven. The Appellant asked Ms. Dates if he should turn himself in, and she told him yes, so he decided he would turn himself in to the police the next morning. Ms. Dates left the motel and started driving to her sister's house. During the drive, the police pulled her over and wanted to know about the Appellant. Ms. Dates was honest with them, went to the police department, and gave a statement. The police told Ms. Dates what had happened in Ms. Taylor's apartment, and Ms. Dates felt "crazy, stupid, hurt" because the Appellant had lied to her. Ms. Dates also felt "relief" because she had wanted to end her relationship with the Appellant, but he had refused. Ms. Dates was charged with being an accessory after the fact, but the charge was later dropped. She said that after the police pulled her over on August 17, she never spoke with the Appellant again. The Appellant tried to contact her, but she did not answer his telephone calls.

On cross-examination, Ms. Dates acknowledged that the Appellant had "marks" on his forehead on August 16. She said he looked like he had been in a fight.

Sergeant Eric Kelly of the MPD testified that he went to the crime scene on August 16, 2015. Kaili Taylor was being treated in an ambulance, and the Appellant was identified as a suspect. On the night of August 17, the police located the Appellant at a motel in Whitehaven and brought him to the police department. The Appellant had two iPhones, one of which belonged to Ms. Taylor. Sergeant Kelly gave Ms. Taylor's iPhone to Lieutenant Roosevelt Twilley in the I-Tech Unit for a "phone dump." Sergeant Kelly later received a disk containing the information from Ms. Taylor's iPhone.

Sergeant Kelly testified that he read the Appellant his rights from an advice of right form and that the Appellant refused to answer any questions without his attorney present. Sergeant Kelly telephoned the Appellant's attorney, Sam Perkins, and Mr. Perkins came to the police department. Sergeant Kelly read the Appellant another advice of rights form, and the Appellant signed the form at 12:22 a.m. on August 18. The Appellant gave the following statement in the presence of his attorney: The Appellant went to Ms. Taylor's apartment about 6:00 a.m. on August 16. They had sex and went to his apartment in Cordova about 8:00 a.m. They watched television for one hour, left his apartment to return to her apartment, and argued about "'finances, the vehicle and money.'" When the Appellant and Ms. Taylor arrived at her apartment, the Appellant "'punched'" her in the nose, and they began fighting. The Appellant asked Ms. Taylor "'to call the guy she was borrowing money from to prove that nothing was going on.'" Ms. Taylor dialed Mr. Lampkin's number, the Appellant "'snatched'" the telephone from

her, and he told her, "'I don't have an issue with that guy, my issue [is] with you.'" The Appellant "'inadvertently'" called Mr. Lampkin on Ms. Taylor's telephone. The Appellant and Ms. Taylor continued to fight, and the Appellant told Ms. Taylor to "'go clean up her face.'" The Appellant was arguing and cursing, and "'about that time [Mr. Lampkin] came in the door.'" The Appellant and Mr. Lampkin "'exchanged words.'" Mr. Lampkin told the Appellant that he would "'blow [the Appellant's] ass off'" and "'gestured like he had a gun under his shirt.'" The Appellant pulled his own gun up to his side, and Mr. Lampkin "'rushed'" him. They began to fight and struggle, and Mr. Lampkin bit the Appellant and put him in a chokehold. While the Appellant was trying to get out of the chokehold, his gun "'went off'" twice. However, only one gunshot hit Mr. Lampkin. Mr. Lampkin let go of the Appellant; the Appellant picked up his gun, a bullet casing, and his shirt, which had been ripped off during the fight; and the Appellant left the scene.

Sergeant Kelly testified that the Appellant claimed that he threw his forty-five-caliber gun into a dumpster and that he disposed of the weapon because he was scared. The Appellant denied using Ms. Taylor's telephone to text Mr. Lampkin and said that he punched and slapped Ms. Taylor ten to fifteen times. During the Appellant's and Ms. Taylor's argument, Ms. Taylor was wearing her gun in a holster on her side, and the Appellant was wearing his gun in a holster on his side. Both of them had the same type of holster, which the Appellant described as "'an inside carry holster, a conceal holster.'" Although Mr. Lampkin "gestured as if he had a gun," the Appellant never actually saw Mr. Lampkin with a firearm. After the shooting, the Appellant "'grabbed the first bag that [he] saw,'" which was Ms. Taylor's purse. The Appellant said he did not call the police "'[b]ecause neighbors were outside on the phone, describing the situation'" as he walked out of the victim's apartment. The Appellant was injured during his fight with Mr. Lampkin, but he did not go to a hospital.

Sergeant Kelly testified that the Appellant had "like an abrasion" on his left eyelid, and a "carpet burn" on his right knee. The Appellant claimed he had two injuries on his left arm and a bite mark on the right side of his back. He also claimed he injured his elbow, knuckles, and a finger during his fight with Mr. Lampkin. Sergeant Kelly photographed the Appellant's injuries, and the State introduced the photographs into evidence. Sergeant Kelly said the Appellant was "arrogant" during the interview and was "very much trying to manipulate the facts of the case to try to turn himself into a victim."

Sergeant Kelly testified that he typed the Appellant's statement. The Appellant read the statement and made corrections, and Sergeant Kelly asked the Appellant to demonstrate Mr. Lampkin's chokehold. The Appellant had his attorney stand behind him, "reach up around him with both hands," and pretend to choke him "with both arms around his neck." The Appellant then demonstrated how he "reache[d] around with his

right hand" and shot Mr. Lampkin. At that point, Sergeant Kelly asked the Appellant, "'Are you sure that that is the bullshit that you want to stand with?'" The Appellant looked at Sergeant Kelly "[in]credulously," and Sergeant Kelly pointed out to the Appellant that there was no way he could have shot Mr. Lampkin as he had demonstrated because all of Mr. Lampkin's injuries were on his right side. The Appellant's attorney asked to speak with the Appellant alone, so Sergeant Kelly left the interview room. When Sergeant Kelly returned, the Appellant told Sergeant Kelly that he had decided to "stick with" his story. Sergeant Kelly explained to the jury that if the Appellant had shot Mr. Lampkin as he had demonstrated, "the victim would have been shot on his left side."

Sergeant Kelly testified that the Appellant claimed he threw his gun into a dumpster in an area of Memphis known as Frayser. Police went to Frayser and found the dumpster but did not find the gun.

On cross-examination, Sergeant Kelly testified that to his knowledge, a phone dump did not erase information from a telephone. Therefore, Ms. Taylor's information should have remained in her iPhone. Sergeant Kelly said he did not see a bite mark on the Appellant's back. He acknowledged that the Appellant would not have received the carpet burn on his knee while standing.

Lieutenant Roosevelt Twilley testified that he performed the phone dump on Ms. Taylor's iPhone. He explained that "[a] phone dump is nothing but the transferring of data from the phone to our server where we then put it on something that is credible for you all to read." Lieutenant Twilley was asked to look for texts between Ms. Taylor's and Mr. Lampkin's telephones on August 16, 2015, but did not find any texts. Therefore, the texts never existed or were deleted. Lieutenant Twilley said he did not delete any information from Ms. Taylor's iPhone.

Jill Sparks, a custodian of records for Sprint, identified the August 16, 2015 records for Mr. Lampkin's telephone and testified that seventy-eight texts were exchanged between Mr. Lampkin's and Ms. Taylor's telephones that day. The texts began at 8:20 a.m. when a text was sent from Mr. Lampkin's telephone to Ms. Taylor's telephone, and the texts continued until 11:35 a.m. when a text was sent from Ms. Taylor's telephone to Mr. Lampkin's telephone. Several calls also were placed between the two telephones during that time period. On cross-examination, Ms. Sparks testified that Sprint did not retain the text messages.

Dr. Grant Bond, a fourth-year surgery resident at the University of Tennessee, testified as an expert in general surgery that on August 16, 2015, he treated Kaili Taylor in the emergency room at Regional One Health. Ms. Taylor had bruising and swelling to her face and body, and Dr. Bond determined that her injuries warranted a CT scan of her

head, face, cervical spine, chest, abdomen, and pelvis. Ms. Taylor was found to have "extensive facial fractures," including a broken nose. She also had lacerations on her face and received stitches in her left temple. Ms. Taylor was released from the hospital that same day.

Deonna Wimbley testified that she and the Appellant met in the summer of 2013 and began dating. They continued dating after he was incarcerated in this case and married in April 2016. The Appellant told Ms. Wimbley the following regarding the incident on August 16, 2015: Ms. Taylor came to the Appellant's apartment that day to get her belongings, and the Appellant was going to "cut ties" with Ms. Taylor so he could be with Ms. Wimbley. The Appellant and Ms. Taylor began arguing, and they went to her apartment to discuss something personal and so the Appellant could get some money from Ms. Taylor. Their argument escalated, and Mr. Lampkin came into the apartment. The Appellant and Mr. Lampkin "exchanged words" and began to fight, and Mr. Lampkin "slammed" the Appellant against the door and bit the Appellant. The Appellant ended up on his knees with Mr. Lampkin standing behind him, choking him. Ms. Wimbley said the Appellant shot Mr. Lampkin "three [times] on the side and somewhere else, I don't remember."

Ms. Wimbley testified that the Appellant claimed Ms. Taylor "made up a story." The Appellant wanted Ms. Wimbley to contact Ms. Taylor and get Ms. Taylor to tell the truth, so Ms. Wimbley contacted Ms. Taylor in November or December 2015. She continued to contact Ms. Taylor for several months. Ms. Wimbley stated that she thought the Appellant and Ms. Taylor were just friends but that she always questioned their relationship. At some point, Ms. Wimbley learned the Appellant was still contacting Ms. Taylor from jail. Ms. Wimbley said that she was "tired of it" and that she stopped answering his calls. Ms. Wimbley last spoke with the Appellant on December 4, 2016.

At the conclusion of Ms. Wimbley's testimony, the State rested its case. The Appellant did not present any proof, and the jury convicted him as charged of first degree felony murder committed during the perpetration of kidnapping in count one; especially aggravated kidnapping with a deadly weapon in count two; aggravated kidnapping involving bodily injury in count three; and employing a firearm during the commission of aggravated kidnapping in count five. The jury also convicted him of reckless aggravated assault as a lesser-included offense of aggravated assault by strangulation in count four. The trial court immediately sentenced him to life for the first degree felony murder conviction. After a sentencing hearing, the trial court sentenced the Appellant to twenty years for especially aggravated kidnapping, a Class A felony; ten years for aggravated kidnapping, a Class B felony; eight years for employing a firearm during the commission of a dangerous felony, a Class C felony; and three years for reckless aggravated assault, a Class D felony. The trial court ordered that the Appellant serve the twenty-, ten-, and

three-year sentences concurrently with each other but that he serve the effective twenty-year sentence and his eight-year sentence for employing a firearm consecutively to each other and the life sentence for a total effective sentence of life plus twenty-eight years.[1]

## II. Analysis

### A. White Instruction

On appeal, the Appellant contends that the trial court committed reversible error by failing to instruct the jury properly on kidnapping as required by State v. White, 362 S.W.3d 559 (Tenn. 2012), because Ms. Taylor's kidnapping was incidental to Ms. Taylor's aggravated assault. The State argues that the Appellant has waived this issue because he did not object to the jury instructions at trial and because he failed to raise the issue in his motion for new trial. The State also argues that the Appellant is not entitled to plain error relief. We agree with the State.

In White, our supreme court cautioned that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." 362 S.W.3d at 578. To effectuate this end, our supreme court devised the following instruction to be given by trial courts:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> • the nature and duration of the victim's removal or confinement by the defendant;
>
> • whether the removal or confinement occurred during the commission of the separate offense;

---

[1] As noted by the trial court, the Appellant was statutorily required to serve the eight-year sentence for employing a firearm consecutively to the life sentence. See Tenn. Code Ann. § 39-17-1324(e)(1).

• whether the interference with the victim's liberty was inherent in the nature of the separate offense;

• whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

• whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

• whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

Id. at 580–81.

The Appellant conceded at oral argument that he did not raise this issue in his motion for new trial and requested that we review the issue for plain error. See Tenn. R. App. P. 3(e); State v. Gary S. Holman, No. E2012-01143-CCA-R3-CD, 2014 WL 295610, at *12 (Tenn. Crim. App. at Knoxville, Jan. 27, 2014) (concluding that White instruction issue could only be reviewed for plain error based, in part, on defendant's failure to include issue in motion for new trial). We may only consider an issue as plain error when all five of the following factors are met:

a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotation marks and citation omitted).

The State charged the Appellant with aggravated assault for his allegedly strangling Ms. Taylor in his apartment and the alternative theories of especially aggravated kidnapping and aggravated kidnapping of Ms. Taylor. Kidnapping involves false imprisonment, which is defined as the knowing removal or confinement of another

- 16 -

unlawfully so as to interfere substantially with the other's liberty. Tenn. Code Ann. §§ 39-13-302(a), -303(a). The jury ultimately convicted him of reckless aggravated assault as a lesser-included offense of aggravated assault by strangulation. The jury also convicted him of especially aggravated kidnapping and aggravated kidnapping as charged in the indictment.

The proof at trial revealed that the Appellant was using Ms. Taylor's telephone when Ms. Taylor received a text message from Mr. Lampkin. The Appellant became upset because he thought Ms. Taylor was having a sexual relationship with Mr. Lampkin. The Appellant kept Ms. Taylor's telephone, took her purse containing her keys and her handgun out of her car, and put her keys and gun into his pockets. He confined Ms. Taylor to her apartment while he beat her and searched her telephone for information. He then drove her to his apartment where he continued to search her telephone and where she claimed he strangled her. The Appellant then drove Ms. Taylor back to her apartment where he continued to beat her and ended up shooting Mr. Lampkin. The Appellant's confinement of Ms. Taylor spanned several hours whereas the assault in his apartment was only a small part of that confinement. Therefore, we have no hesitation in concluding that the Appellant's confinement of Ms. Taylor went beyond that necessary to perpetrate the assault. Accordingly, while the trial court should have given a White instruction, the trial court's error was harmless, and the Appellant is not entitled to plain error relief.

## B. Sufficiency of the Evidence

Next, the Appellant contends that first degree felony murder "does not apply" in this case because there is an insufficient nexus between the underlying felony of kidnapping and Mr. Lampkin's death. The State addresses the issue as sufficiency of the evidence and argues that the evidence is sufficient. We agree with the State.

At oral argument, defense counsel contended that he was not raising sufficiency of the evidence. However, our supreme court and this court have addressed claims regarding the nexus between first degree felony murder and the underlying felony as sufficiency-of-the-evidence claims. See State v. Pierce, 23 S.W.3d 289, 293-96 (Tenn. 2000); State v. Raymond Lee Swett, Jr., No. M2011-00439-CCA-R3-CD, 2013 WL 53993, at *12-15 (Tenn. Crim. App. at Nashville, Jan. 4, 2013); State v. Patrick Wingate, No. M1999-00624-CCA-R3-CD, 2000 WL 680388, at *7-8 (Tenn. Crim. App. at Nashville, May 25, 2000). Even the cases primarily relied on by the Appellant in his brief, State v. Buggs, 995 S.W.2d 102, 105-09 (Tenn. 1999), and State v. Lee, 969 S.W.2d 414, 416-17 (Tenn. Crim. App. 1997), addressed the nexus between the murder and the underlying felony as sufficiency of the evidence. Therefore, we will do so here. We note that to hold otherwise would mean the Appellant has waived the issue because

he raised sufficiency of the evidence in his motion for new trial but did not raise the nexus between the murder and the underlying felony in his motion for new trial. See Tenn. R. App. P. 3(e). He also did not argue that we review the issue for plain error. See State v. Walls, 537 S.W.3d 892, 901 (Tenn. 2017) (cautioning that it is incumbent upon an appellant "to persuade an appellate court that plain error occurred that was sufficient to change the outcome of the trial").

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, first degree felony murder is "[the] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping." Tenn. Code Ann. § 39-13-202(a)(2). Kidnapping is "false imprisonment . . . under circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code

Ann. § 39-13-303(a).[2]  "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere with the other's liberty." Tenn. Code Ann. § 39-13-302(a).

As this court has explained,

> It is well established that before a killing will "fall within the definition of felony murder, [it] must have been 'done in pursuance of the unlawful act, and not collateral to it.'" State v. Banks, 271 S.W.3d 90, 140 (Tenn. 2008) (citing State v. Rice, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting Farmer v. State, 296 S.W.2d 879, 883 (1956))). "In other words, 'The killing must have had an intimate relation and close connection with the felony . . . , and not be separate, distinct, and independent from it[.]'" Farmer, 296 S.W.2d at 883 (quoting Wharton on Homicide, § 126 (3rd ed.)); see also, e.g., Banks, 271 S.W.3d at 140; State v. Thacker, 164 S.W.3d 208, 223 (Tenn. 2005). To satisfy the requirement of "an intimate relation and close connection," "the killing 'may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action.'" Thacker, 164 S.W.3d at 223 (quoting State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999)). Moreover, "there should be a causal connection between the killing and the felony." Buggs, 995 S.W.3d at 106 (citing Farmer, 296 S.W.2d at 884; State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988)). Requiring a causal connection between the homicide and the underlying felony promotes the deterrent effect of the rule by precluding a first degree murder conviction for "killings which are collateral to and separate from the underlying felony." State v. Pierce, 23 S.W.3d 289, 295 (Tenn. 2000). "Moreover, requiring a close nexus between the [underlying felony] and the killing is particularly appropriate given that the felony murder rule is 'a legal fiction in which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first-degree murder.'" Id. (quoting Buggs, 995 S.W.2d at 107).

---

[2] During oral argument, the State noted that the charge of first degree felony murder in the indictment did not specify whether the victim of the underlying kidnapping was Ms. Taylor or Mr. Lampkin and that the evidence was sufficient to show that the Appellant kidnapped both Ms. Taylor and Mr. Lampkin. However, the only victim named in the indictment for kidnapping was Ms. Taylor. Moreover, the proof at trial focused on the kidnapping of Ms. Taylor as the underlying felony, not Mr. Lampkin. During the State's rebuttal closing argument, the prosecutor stated, "If you believe the State has met [its] burden and proved that he kidnapped Kaili [Taylor] and that a killing resulted, during or as part of all of that, then he is guilty of first degree murder."

- 19 -

A killing will be considered to have been committed "in the perpetration of" the underlying felony "where the homicide is so closely connected with the underlying felony as to be within the res gestae thereof, or where the homicide is so linked to the felony as to form one continuous transaction." Buggs, 995 S.W.3d at 106 (citing 40 Am. Jur. 2d Homicide § 67 (1999)). "The res gestae embraces not only the actual facts of the transaction and the circumstances surrounding it, but also the matters immediately antecedent to the transaction and having a direct causal connection with it, as well as acts immediately following it and so closely connected as to form in reality a part of the occurrence." State v. Patrick Wingate, No. M1999-00624-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, May 25, 2000) (citing Payne v. State, 406 P.2d 922, 925 (Nev. 1965)). [For example,] [w]hen the predicate felony is theft, the killing must be "closely connected to the initial taking of the property in time, place, causation, and continuity of action." See Pierce, 23 S.W.3d at 296 (citation omitted).

State v. Joseph Egan Underwood, No. E2013-01221-CCA-R3-CD, 2014 WL 891037, at *11 (Tenn. Crim. App. at Knoxville, Mar. 6, 2014).

The Appellant does not contest that he kidnapped Ms. Taylor. Instead, he contends that Ms. Taylor's kidnapping was complete as soon as Mr. Lampkin attacked him because at that point, he was no longer controlling Ms. Taylor and she was able to escape. He also contends that while Mr. Lampkin's killing was connected to Ms. Taylor's kidnapping in time and place, the killing did not share the same causation as the kidnapping because he did not kill Mr. Lampkin in order to continue his confinement of Ms. Taylor or to prevent her escape.

Taken in the light most favorable to the State, the proof at trial showed that the Appellant confined Ms. Taylor for several hours. During that time, he texted Mr. Lampkin while pretending to be Ms. Taylor in an attempt to lure Mr. Lampkin to Ms. Taylor's apartment. When Mr. Lampkin agreed to go to Ms. Taylor's apartment, the Appellant, still pretending to be Ms. Taylor, texted to Mr. Lampkin that Ms. Taylor was in the shower and that Mr. Lampkin was to come inside the apartment when he arrived. The Appellant even unlocked the front door and turned on the shower in order to trick Mr. Lampkin into thinking Ms. Taylor had invited him there. When Mr. Lampkin entered the apartment and sat on the couch, the Appellant dragged Ms. Taylor into the living room, pointed the gun at Mr. Lampkin, and ordered Mr. Lampkin to take off his clothes. He also told Mr. Lampkin that Mr. Lampkin should tell the truth about his relationship with Ms. Taylor because "you see what I did to the bitch." Mr. Lampkin

"rushed" the Appellant, which distracted the Appellant and gave Ms. Taylor the opportunity to run outside. The Appellant's argument would have us to believe that as soon as Mr. Lampkin rushed the Appellant, the Appellant no longer intended to confine Ms. Taylor and that she was free to leave. That obviously was not the case. The only reason Ms. Taylor was able to escape from the Appellant was because he could not stop her from leaving while he was being physically confronted by Mr. Lampkin. In sum, the evidence overwhelmingly supports the Appellant's conviction for first degree felony murder.

We note, though, that the jury convicted the Appellant of especially aggravated kidnapping and aggravated kidnapping in which Ms. Taylor was the named victim. The trial court even advised the jury, "It is different theories the state can put in the indictment, different theories of ways to commit a crime and you have to decide whether or not they've proven those elements to your satisfaction beyond a reasonable doubt." When a jury convicts under alternative theories, the trial court must merge the convictions. See, e.g., State v. Cribbs, 967 S.W.2d 773, 778 (Tenn. 1998) (discussing merger of convictions for first degree premeditated and felony murder). However, the trial court failed to do so in this case. Therefore, the case must be remanded to the trial court for amendment of the judgments to reflect that the Appellant's conviction of aggravated kidnapping in count three merges into his conviction of especially aggravated kidnapping in count two. Given that the Appellant was to serve the sentences for the two convictions concurrently, the merger does not affect the length of his total effective sentence.

Moreover, the case must be remanded to the trial court because the judgments of conviction for counts two through five are incorrect with regard to concurrent and consecutive sentencing. The trial court ordered that the Appellant serve his twenty-, ten-, and three-year sentences concurrently with each other for an effective sentence of twenty years. The trial court then ordered that he serve the life sentence in count one, the effective twenty-year sentence in counts two through four, and the eight-year sentence in count five consecutively. The trial court stated twice that "it will be life, plus twenty, plus eight," yet none of the judgments of conviction for counts two through five correctly reflect the trial court's pronouncement of concurrent and consecutive sentencing. Therefore, the case is remanded to the trial court for the correction of those judgments to show that the Appellant is to serve the sentences for counts two, three, and four concurrently with each other but consecutively to the life sentence for count one and that he serve the eight-year sentence for count five consecutively to the sentences for counts one, two, three, and four.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the Appellant's convictions and his total effective sentence of life plus twenty-eight years. However, we remand the case to the trial court for amendment of the judgments to reflect that count three is merged into count two and for correction of the judgments for counts two through five to reflect correctly the trial court's pronouncement of concurrent and consecutive sentencing.

_____
NORMA MCGEE OGLE, JUDGE